PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

COLGAN AIR, INCORPORATED,
$\quad$ *Plaintiff-Appellant,*

v.

RAYTHEON AIRCRAFT COMPANY,
$\quad$ *Defendant-Appellee.*

No. 06-1069

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(1:05-cv-00213-TSE)

Argued: May 24, 2007

Decided: October 18, 2007

Before KING and GREGORY, Circuit Judges, and
Frank D. WHITNEY, United States District Judge for the
Western District of North Carolina, sitting by designation.

Affirmed in part, vacated in part, and remanded by published per
curiam opinion.

## COUNSEL

**ARGUED:** Mark Andrew Dombroff, DOMBROFF & GILMORE,
P.C., McLean, Virginia, for Appellant. Michael Gordon Jones, MAR-
TIN, PRINGLE, OLIVER, WALLACE & BAUER, L.L.P., Wichita,
Kansas, for Appellee. **ON BRIEF:** Morgan W. Campbell, Thomas B.
Almy, DOMBROFF & GILMORE, P.C., McLean, Virginia, for

Appellant. Robert T. Hall, Holly Parkhurst Essing, HALL, SICKELS, FREI & KATTENBURG, Reston, Virginia; William L. Oliver, Jr., MARTIN, PRINGLE, OLIVER, WALLACE & BAUER, L.L.P., Wichita, Kansas, for Appellee.

## OPINION

PER CURIAM:

Plaintiff Colgan Air, Inc., ("Colgan") appeals the district court's order granting summary judgment for Defendant Raytheon Aircraft Company ("Raytheon") on Colgan's claims of negligence, strict liability, and breach of express and implied warranties arising out of the crash of a Beech 1900D aircraft (Registration No. N240GJ) ("Aircraft") that resulted in the death of the pilot and co-pilot. Colgan alleged that several errors in the maintenance manual for the Aircraft, which was created and published by Raytheon, caused the fatal crash. In a published decision awarding summary judgment for Raytheon, *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 404 F. Supp. 2d 893 (E.D. Va. 2005), the district court held that the Used Airliner Airplane Warranty, executed by Colgan as part of its lease of the Aircraft, contained a waiver of right, which barred all of Colgan's claims against Raytheon. We affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

I.

A.

Colgan is a Virginia corporation that operates a regional air carrier in Virginia. As part of its business operation, Colgan contracted to lease several aircraft from both Raytheon Aircraft Credit Corporation ("RACC") and Raytheon Airline Aviation Services, LLC, ("RAAS"). RACC financed and leased to Colgan the Aircraft that is the subject of this matter.

Raytheon, a Kansas corporation, manufactured the Aircraft and also created, edited, and published the maintenance manuals for the

Aircraft. Raytheon is a separate and independent company from the lessors of the Aircraft; however, Raytheon and RACC are both wholly-owned subsidiaries of Raytheon Aircraft Holdings, Inc. RAAS is a wholly-owned subsidiary of RACC and otherwise has no direct relationship to Raytheon.

Colgan executed several documents throughout the process of leasing the Aircraft, including the Definitive Agreement, Lease Agreement, and Side Letter Agreement that incorporated and modified the Used Airliner Airplane Warranty. On August 1, 2002, Colgan, RAAC, and RAAS[1] entered into the "Definitive Agreement," whereby the parties agreed to certain terms that would govern transactions among them as they related to the leasing of several aircraft. Essentially, the Definitive Agreement was the broad contractual statement regarding how all the aircraft were going to be leased by Colgan from RACC and RAAS. Among other general provisions that would govern the leasing of aircraft, the Definitive Agreement stated that RAAS would provide to Colgan "Support Items," which included a maintenance manual.[2] Additionally, the Definitive Agreement provided that the aircraft were to be leased pursuant to the terms of a form lease, which was attached to the Definitive Agreement as Appendix 1 and entitled "Operating Lease Agreement between Raytheon Aircraft Credit Corporation and Colgan Air, Inc." ("Lease Agreement"). Colgan and RACC signed the Lease Agreement for the Aircraft on January 3, 2003, and the Aircraft entered service with Colgan the very next day.

The Lease Agreement specifically provided that RACC was not the manufacturer of the Aircraft, stated that it was providing the Aircraft "as is," and disclaimed all warranties and liability. The Lease Agree-

---

[1]Notably, RAAS and RACC are not parties to this lawsuit, notwithstanding the fact it was RAAS and RACC — not Raytheon — who entered into the Definitive Agreement, Lease Agreement, and Side Letter Agreement, all of which governed Colgan's lease of the Aircraft.

[2]The parties dispute whether or not RAAS actually provided Colgan with a maintenance manual under the terms of the Definitive Agreement. The parties presented conflicting evidence on this fact, thereby creating an issue of fact for the jury. Because this bears on our reversal of the district court's ruling, this issue is more fully developed in our analysis.

ment further provided that Colgan was under an obligation to maintain the Aircraft in accordance with the manufacturer's maintenance manuals and in compliance with all applicable Federal Aviation Regulations. The lease also stated that any manufacturer warranty would be subject to a separate contractual agreement, called the Used Airliner Airplane Warranty.

On January 9, 2003, RAAS supplied the Used Airliner Airplane Warranty pursuant to a Side Letter Agreement between RAAS and Colgan, which provided that the terms of the Used Airliner Airplane Warranty were otherwise applicable to the lease transaction. Raytheon was not a party to this Side Letter Agreement, although Raytheon was the issuer of the Used Airliner Airplane Warranty. The Used Airliner Airplane Warranty stated that Raytheon warrants that "each part of the Aircraft," except avionics equipment and engines, were free from defects in materials, workmanship, or design for a period of thirty days. (J.A. at 361). The Side Letter Agreement between Colgan and RAAS extended the manufacturer's warranty for the Aircraft from thirty days to ninety days. (J.A. at 359).

The Used Airliner Airplane Warranty also contained a disclaimer of warranties and an exclusive remedy provision. Specifically, the Used Airliner Airplane Warranty stated the following:

> 3. TO THE EXTENT ALLOWED BY APPLICABLE LAW, BUYER WAIVES AS TO RAYTHEON AND SELLER ALL OTHER WARRANTIES, WHETHER OF MERCHANTABILITY, FITNESS OR OTHERWISE. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF.

> 4. TO THE EXTENT ALLOWED BY APPLICABLE LAW, THE OBLIGATIONS OF RAYTHEON SET FORTH HEREIN SHALL BE THE EXCLUSIVE REMEDIES FOR ANY BREACH OF WARRANTY HEREUNDER, AND, TO THE SAME EXTENT NEITHER RAYTHEON NOR SELLER SHALL BE LIABLE FOR ANY GENERAL, CONSEQUENTIAL OR INCIDENTAL DAMAGES, INCLUDING, WITHOUT

LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OR LOSS OF PROFITS, OR ANY DAMAGES TO THE AIRCRAFT CLAIMED BY BUYER OR ANY OTHER PERSON OR ENTITY UPON THE THEORIES OF NEGLI-GENCE OR STRICT LIABILITY IN TORT.

(J.A. at 361).

## B.

On August 26, 2003, the Aircraft crashed off the coast of Massa-chusetts shortly after takeoff, destroying the Aircraft and killing the only two passengers onboard: the pilot and co-pilot. Immediately prior to the accident, Colgan's mechanics had performed a mainte-nance procedure installing a new elevator trim tab cable. Colgan's maintenance crew performed the procedure using the maintenance manual for the Aircraft, which was published by Raytheon.[3] The par-ties agree that Colgan's maintenance personnel, referencing the main-tenance manual then in effect, installed the trim tab cable such that the trim tabs operated in reverse.

The REPS Manual contained a section within Chapter 27 entitled "Flight Controls-Description and Operation," which included the fol-lowing language:

> Proper winding of the cables on the pedestal and actuator drums, is shown in . . . the *Elevator Tab Control Cable Winding illustration in Chapter 27-30-04* for elevator tabs, ensures against crossing the cables and causing improper trim tab movement.

---

[3]As noted by the district court, Raytheon issued maintenance manuals in both paper and electronic format. The electronic version was called the Raytheon Electronic Publications Program Maintenance Library for the Beech 1900 Aircraft ("REPS Manual"). Colgan used both types of manu-als in maintaining their fleet of 1900 Series aircraft. It is undisputed that the substantive content of both manuals was identical. With respect to the maintenance performed on the trim tab cables at issue here, Colgan con-tends it exclusively used the REPS Manual.

(J.A. at 156A). Clicking on the underlined portion of the language above led to Figure 201 of Chapter 27-30-04, which depicted the forward trim cable drum backwards, or 180 degrees from the properly installed position, and shows the open, keyed side of the drum, instead of the flat side. Colgan claimed that its maintenance crew followed the REPS Manual's directions as depicted in Figure 201, resulting in the reversal of the action of the elevator manual trim system.

Colgan also asserted that the table of contents for Chapter 27 failed to contain a reference or hyperlink to an operational check that would have revealed the problem with the trim tabs. Because Colgan's maintenance personnel did not locate or find the appropriate operational check, which was included in both the paper and REPS versions of the manual, they proceeded to devise their own check. Their check was not sufficient to disclose the problem with the Aircraft's elevator trim system. Colgan contended that these two defects with the REPS Manual — the reverse drawing and the missing hyperlink — proximately caused the Aircraft to crash. These defects appeared in all relevant versions of the manual, both electronic and paper.

As a result of the maintenance procedure, when cockpit controls were used to set the trim tabs at a nose up position, the trim tabs actually moved to a nose down position. Because the trim tabs operated in reverse, the Aircraft was unable to gain altitude following take-off and ultimately crashed. Neither maintenance crew nor the pilots discovered the error prior to the fatal flight.

C.

Colgan filed a complaint in the United States District Court for the Eastern District of Virginia on the basis of diversity of citizenship, alleging state law claims against Raytheon for breach of express and implied warranties, negligence, and strict liability. Raytheon disputed all claims and also asserted that any defects in the manual did not proximately cause the accident. Raytheon also defended on the basis that the maintenance manual was part of the Aircraft such that the claims were barred by the disclaimer in the Used Airliner Airplane Warranty. Following discovery, both parties moved for summary judgment.

In granting summary judgment for Raytheon, the district court did not rule on the cause of the accident, but proceeded upon the premise that the defects in the maintenance manual existed and were the proximate cause of the crash. After considering the Used Airliner Airplane Warranty, the district court concluded the manual was "part of the Aircraft" and therefore governed by the terms of the Used Airliner Airplane Warranty. Consequently, Colgan had no warranty rights against Raytheon except the ninety-day limited warranty, which had expired by the time of the crash. The district court also ruled that, by entering into the Used Airliner Airplane Warranty, Colgan had waived all claims based on negligence or strict liability in tort that it might have had against Raytheon. The court noted that its determination that Colgan alone bore the risk of loss for the Aircraft "from any cause whatsoever" was consistent with all the documents accompanying the transaction, including those executed by RAAS and RACC and where Raytheon was not a party.

In an alternative ruling, the district court rejected Colgan's argument that the language within the manual rose to the level of an express warranty and also concluded that Massachussets law did not permit Colgan's claim for strict liability. For these reasons, the district court granted summary judgment in favor of Raytheon on all claims, and Colgan timely appealed.

## II.

Our standard of review in this case is well-settled. We review de novo a district court's order granting summary judgment and view the facts in the light most favorable to the nonmoving party. *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997). Because we sit in diversity in this case, we must apply the substantive law of the forum state including its choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938).

Because this action was filed in Virginia, we look to that state's laws to determine which state's laws govern Colgan's claims. Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances, none of which exist here. *See, e.g., Hitachi Credit America Corp. v. Signet*

*Bank*, 166 F.3d 614, 624 (4th Cir. 1999). Here, the Used Airliner Airplane Warranty included a choice of law clause designating the law of Kansas. Thus, Kansas law is applicable to our analysis regarding the application of the Used Airliner Airplane Warranty.

Under Virginia law, the rule of lex loci delicti, or the law of the place of the wrong, applies to choice-of-law decisions in tort actions. *Milton v. IIT Research Inst.*, 138 F.3d 519, 522 (4th Cir. 1998); *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 914 n.4 (E.D. Va. 2004); *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006). Under the rule of lex loci delicti, Massachusetts law, the situs of the crash, applies to the analysis of the claims for negligence, strict liability, and breach of express and implied warranties.

III.

A.

Colgan first contends the district court erred in granting summary judgment for Raytheon pursuant to the Used Airliner Airplane Warranty, which the district court concluded barred all of Colgan's claims. The gravamen of Colgan's argument on appeal is that the law does not support a ruling that the maintenance manual was "part of the Aircraft." According to Colgan, this faulty conclusion by the district court resulted in error in the court's ultimate ruling that the disclaimer and waiver of rights contained in the Used Airliner Airplane Warranty precluded Colgan's claims against Raytheon for defects contained in the maintenance manual. We agree.

The district court ruled that the maintenance manual was "part of the Aircraft" as a matter of law for several reasons: (1) other courts have concluded that "a product, such as an aircraft, and its maintenance or other operational manuals are a single, integrated product," Colgan Air, Inc., 404 F. Supp. 2d at 903 (citations omitted); (2) the Federal Aviation Regulations support the conclusion that an aircraft's maintenance manual is an integrated part of the aircraft; and (3) the fact that Colgan may have purchased the maintenance manual in a separate transaction is immaterial to determining that a maintenance

manual and an aircraft are a single product. We address each of these conclusions in turn and deem them erroneous.

Colgan first argues that the district court erred in concluding that the maintenance manual and the Aircraft were a "single, integrated product" because the maintenance manual, like a flight manual, is "indispensable to maintain the aircraft's airworthiness certificate without which the aircraft cannot be flown or used." Id. at 903. For these reasons, according to the district court, the maintenance manual was "part of the Aircraft" such that the Used Airliner Airplane Warranty also applied to bar claims arising from the use of the maintenance manual.

In support of its ruling on an issue of first impression under Kansas law, the district court looked to various jurisdictions for guidance and broadly applied cases where the courts have suggested that a flight manual, which Federal Aviation Regulations require to be onboard an aircraft at all times, was not a separate product from the aircraft. *See Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1220-21 (10th Cir. 1991) (holding that replacement flight manual was not a separate product for purposes of the Indiana Products Liability Act and the statute of repose); *see also Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155, 1157 (9th Cir. 2000) (holding that flight manual is "part" of a helicopter that does not restart the applicable statute of repose within the meaning of the General Aviation Revitalization Act).

Nearly all of the cases cited by the district court generally considered the issue of whether a supplement to a flight manual, which failed to include a warning regarding defects in the aircraft, constituted a continuing failure to warn and could restart the statute of repose for limitations purposes. The courts in those cases held that the duty to warn arose at the time of the transaction involving the sale of the aircraft, and the failure to add a warning in subsequent updates to the flight manual could not be used to circumvent the statute of repose. *See Schamel v. Textron-Lycoming*, 1 F.3d 655 (7th Cir. 1993) (affirming district court's dismissal of action for failure to warn of defective condition in engine of aircraft as being barred by the statute of repose); *Alexander*, 952 F.2d at 1222 (rejecting plaintiff's argument that operator manual/handbook was replacement part for purposes of statute of repose; holding the instruction page was not a

separate product so as to recommence the running of the statute of repose).

None of the cases relied on by the district court presented facts where the defect existed in the flight manual alone but was not present in the aircraft. Had the defect existed solely in the flight manual, these cases might carry more weight in the case now before us. *See Driver v. Burlington Aviation, Inc.*, 430 S.E.2d 476 (N.C. Ct. App. 1993) (recognizing that a manual can constitute a separate product from an aircraft for purposes of statute of repose when: (1) the defect only exists in the manual; (2) the relevant product liability act permits such a suit; and (3) the manual was obtained in a separate transaction apart from and following the lease or purchase of the aircraft). Similar to *Driver*, Colgan has only asserted claims arising out of the defect in the manual and has not made any allegation that the Aircraft itself was defective. Thus, although its central issue concerns the statute of repose, *Driver* is more analogous to the case at bar — more so than *Schamel*, *Alexander*, and other cases cited in the district court's order. Nevertheless, the controlling issues in these cases concerned a duty to warn and the statute of repose — two issues not before us in this matter.

These cases are further inapplicable because, for purposes of analysis under these facts, a maintenance manual is not sufficiently similar to a flight manual. A flight manual is used by the pilot and is "necessary to operate the aircraft," *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155, 1157 (9th Cir. 2000), whereas a maintenance manual "outline[s] procedures for the troubleshooting and repair of the aircraft" for the mechanic. *Emory v. McDonnell Douglas Corp.*, 148 F.3d 347, 351 (4th Cir. 1998). Moreover, Federal Aviation Administration ("FAA") regulations require a flight manual to be onboard the aircraft. *See* 14 C.F.R. §§ 121.133, 121.139 (2007). Because a flight manual must be onboard the aircraft, we understand why a court may consider it to be "part of the aircraft" for statute of repose purposes. On the contrary, we are unaware of any federal regulation requiring a maintenance manual to be onboard the aircraft. A maintenance manual, unlike a flight manual, can be used on multiple (albeit identical model) aircraft, which signifies the possibility that a maintenance hangar or other similar facility may be the appropriate place to keep a maintenance manual. For example, the Federal Aviation Regula-

tions expressly contemplate that carriers will arrange for independent contractors to perform maintenance: "A certificate holder may make arrangements with another person for the performance of any maintenance, preventive maintenance, or alterations." 14 C.F.R. § 121.363(b). For these reasons, the district court's reliance on the cases involving flight manuals is misplaced. Accordingly, we reject the district court's conclusion, based on the line of case authority involving flight manuals, that a maintenance manual is part of the aircraft as a matter of law.

Next, Colgan contends that the district court erroneously concluded that Federal Aviation Regulations support treating a maintenance manual and the Aircraft as a single, integrated product. The district court ruled that because "an aircraft's maintenance manual is essential to maintaining an aircraft's airworthiness" under the Federal Aviation Regulations, "an aircraft's maintenance manual is analogous to an 'on-off' switch that must be turned on before the aircraft can be flown." *Colgan Air, Inc.*, 404 F. Supp. 2d at 904. Although we agree federal regulations require aircraft operators to obtain airworthiness certificates before flying the aircraft, the airworthiness standards specifically contemplate and approve alternate methods to maintain the aircraft. Indeed, 14 C.F.R. § 43.13 (2007) provides:

> Each person performing maintenance, alteration, or preventive maintenance on an aircraft, engine, propeller, or appliance shall use the methods, techniques, and practices prescribed in the current manufacturer's maintenance manual or Instructions for Continued Airworthiness prepared by its manufacturer, *or other methods, techniques, and practices acceptable to the Administrator . . . .*

(Emphasis added). Recognizing that a maintenance manual is an acceptable means of compliance, it is not the sole means by which an operator may obtain airworthiness. Therefore, because a maintenance manual is not "essential" to maintaining an aircraft's airworthiness under the Federal Aviation Regulations, it follows that the federal regulations do not support a conclusion that, as a matter of law, a maintenance manual is a component of an aircraft, nor do the regulations indicate that the two constitute a single, integrated product as a matter of law.

Finally, Colgan argues the district court erred in concluding that "it is immaterial whether Colgan received the maintenance manuals pursuant to a subscription it paid for . . . or whether the particular manuals in issue were provided by Raytheon free of charge." *Colgan Air, Inc.*, 404 F. Supp. 2d at 905. The record clearly demonstrates an issue of fact exists as to whether the maintenance manual was provided to Colgan in connection with the Lease Agreement and other documents related to the Used Airliner Warranty. Specifically, the parties dispute the relationship between the maintenance manual and the Aircraft, including the temporal and financial circumstances under which Colgan acquired the manuals. As mentioned above, the parties disagree as to whether RAAS actually provided Colgan with a maintenance manual under the terms of the Definitive Agreement. We disagree with the district court's conclusion that these facts are immaterial to resolution of the issue surrounding the Used Airliner Airplane Warranty. To the contrary, resolution of this fact is relevant because it bears directly on the issue of whether the parties intended and considered the maintenance manual to be "part of the Aircraft" so as to make the Used Airliner Airplane Warranty applicable.

The parties presented conflicting evidence on this fact, thereby creating an issue of fact for the jury. Colgan asserted that it acquired the manual in a separate transaction from Raytheon apart from and independent of the Definitive Agreement. In support of this contention, Colgan presented affidavits, purchase orders, invoices, and check stubs to demonstrate that RAAS did not provide a REPS manual (nor any other maintenance manual), or paper maintenance manual, along with the Aircraft. Instead, Colgan argued it purchased the REPS Manual directly from Raytheon in a separate transaction, along with the subscription service to keep it updated. Further, Colgan asserted that Raytheon did not provide a single free maintenance manual in either paper or REPS form between early 2001 and the date of the accident. On the other hand, Raytheon made a contrary contention and submitted its own affidavits and documents to the district court in support of its position that the maintenance manual was provided free of charge in connection with and in satisfaction of the Definitive Agreement.

This issue of fact is further complicated by the Raytheon Aircraft Company 1900D Airliner Specifications ("Specifications"), which

were prepared by Raytheon and listed in detail what was to be included in each aircraft leased by Colgan from RAAS. The Specifications failed to list a maintenance manual anywhere in the document. (J.A. at 469-74). In contrast, the Specifications listed the Airplane Flight Manuals, which, as discussed above, must be onboard an aircraft. Together, the relationship between the parties and the documents surrounding the lease of the Aircraft raise an issue of fact as to whether Raytheon considered the maintenance manual to be "part of the Aircraft" or an individual product to be acquired via a separate transaction.

In sum, we hold the district court erred in concluding as a matter of law that the maintenance manual is "part of the Aircraft" under the terms of the Used Airliner Airplane Warranty. Neither the Federal Aviation Regulations nor the authority relied on by the district court compel such a result under these facts. Instead, an issue of fact exists as to whether the Used Airliner Airplane Warranty and its attendant disclaimer regarding "each part of the Aircraft" applies to Colgan's claims arising out of the defective maintenance manual.

## B.

Colgan also assigns error to the district court's alternative ruling, whereby it concluded that Massachusetts law barred Colgan's claims for strict liability and breach of express warranty.

### 1.

Turning first to the strict liability claim, the district court ruled that Massachusetts law does not recognize a cause of action for strict liability in tort. *See Sebago, Inc. v. Beazer East, Inc.*, 18 F. Supp. 2d 70, 89 (D. Mass. 1998) ("Massachusetts does not apply § 402A of the Restatement (Second) of Torts, 'and, consequently, there is no recovery on the basis of strict liability in tort under Massachusetts law.'") (quoting *Ramcharran v. Carraro Graphic Equipment, Inc.*, 823 F. Supp. 63, 67 (D. Mass. 1993); *Mason v. General Motors Corp.*, 490 N.E.2d 437, 442 (Mass. 1986)). Instead, as conceded by Raytheon in its brief, "While the scope of liability under Massachusetts' breach of the implied warranty of merchantability may be nearly congruent with that of strict liability, the cause of action remains one for breach of

implied warranty of merchantability, not strict liability." (Brief for Defendant-Appellee, p. 48). In its reply brief, Colgan agreed with Raytheon that a separate claim for strict liability is not permitted under applicable law and that it may recover instead under the theory of breach of implied warranty. Colgan appears to have waived its appeal of this portion of the district court's order. Furthermore, relevant case law cited above supports the district court's ruling. We therefore affirm that portion of the district court's order granting summary judgment for Raytheon on Colgan's claim for strict liability.

2.

Next, we consider whether the district court erred in ruling that the statements in the maintenance manual did not constitute an express warranty as a matter of law.

Colgan contends that the following statement in the maintenance manual constitutes an express warranty under Massachusetts law:

> Proper winding of the cables on the pedestal and actuator drums, is shown in . . . the *Elevator Tab Control Cable Winding illustration in Chapter 27-30-04* for elevator tabs, *ensures against crossing the cables and causing improper trim tab movement.*

(J.A. at 156A (second emphasis added)).

"Express warranties are defined by Massachusetts statute to include affirmations of fact or promises made by sellers relating to their goods, as well as descriptions or samples of the goods." *Wajda v. R.J. Reynolds Tobacco Co.*, 103 F. Supp. 2d 29, 35 (D. Mass. 2000) (citing Mass. Gen. Laws ch. 106, § 2-313). Generally, it is a question of fact for the jury or fact-finder as to whether a statement gives rise to an express warranty. 18 Samuel Williston and Richard A. Lord, *A Treatise on the Law of Contracts* § 52:45 (4th ed. 2007) (citing, *inter alia*, *Goldman v. Barnett*, 793 F. Supp. 28 (D. Mass. 1992)). Massachusetts law recognizes that a jury may find an express warranty where the product contains statements promising that the product performs in a certain manner. For example, in *Roth v. Ray-Stel's Hair*

*Stylists, Inc.*, 470 N.E.2d 137 (Mass. App. Ct. 1984), the court affirmed a jury verdict finding a breach of an express warranty where the product did not perform as promised.

Colgan contends the maintenance manual promises that if the user follows the instructions contained therein — specifically, the illustration in Chapter 27-30-04 — then the cables will not cross and the trim tabs will move properly. Although the statement in this case appears to be buried on one of thousands of pages in the maintenance manual, a jury could nonetheless find that it is a statement that promises how the maintenance manual performs, i.e., that it "ensures" against improper trim tab operation. Furthermore, a jury could reasonably find that in using the product as directed, the maintenance manual failed to perform as warranted, thereby causing the fatal crash. Therefore, we conclude that an issue of fact exists for the jury as to whether the statement constitutes an express warranty.

Notably, the district court relied on *Jones v. Walter Kidde Portable Equipment, Inc.*, 183 F.3d 67, 70 (1st Cir. 1999) (holding that statement in instructional manual does not constitute express warranty as a matter of law). *Jones*, however, does not support the district court's conclusion, but rather shows another issue of fact concerning Colgan's claim for breach of express warranty. The holding in *Jones* requires that a single clause in a manual not be read in isolation of accompanying provisions of the manual. In *Jones*, the court noted, "Where the relied on statement is flanked with another, IMPORTANT advice that something may go wrong and instructions how to guard against it, we hold as a matter of law that the combination cannot be read as a warranty that the event will not happen." *Id.* Thus, *Jones* stands for the proposition that an assertion in an operation manual does not, as a matter of law, create an express warranty if it is surrounded by text that so qualifies and limits its meaning so that it cannot be fairly understood as a promise about the operation of the product to which it pertains.

Here, it is unclear from the record whether a similar qualifying statement — which was so significant in the *Jones* court's ruling — appears in either relevant verison of the maintenance manual at bar. A print-out of the electronic page containing the statement provides at the bottom: "The selection may not include all relevant data, such

as: process specifications, Warnings, Cautions & Notes that may be found elsewhere in the complete document or in other applicable service information . . . ." (J.A. at 156A). Colgan argues this note falls short of the standard set forth in *Jones*. Although the note appears to be advisory, it remains unclear whether the selected text qualifies or limits the manual's statement that adherence to the Elevator Tab Control Cable Winding Illustration would "ensure against crossing the cables and causing improper trim tab movement." (J.A. at 156). Consequently, a jury question exists concerning what the note at the bottom of the print-out means and the effect of this statement. A reasonable trier of fact could find that the note about the print function of the electronic manual did not negate the manual's statement on how the Aircraft's Elevator Tab Control would operate. Thus, the *Jones* case fails to support the district court's ruling that the statement in the maintenance manual does not constitute an affirmation of fact or promise as a matter of law. Accordingly, the district court erred in awarding summary judgment for Raytheon on this claim.

## IV.

In conclusion, the district court erred in concluding that the maintenance manual was part of the Aircraft as a matter of law. To the contrary, a genuine issue of material fact exists as to whether the maintenance manual was a separate product apart from the Aircraft. Consequently, an issue exists for the jury as fact-finder to determine whether the Used Airliner Airplane Warranty, which barred claims outside a ninety (90) day window for "each part of the Aircraft," also applied to bar Colgan's claims for defects in the maintenance manual. Additionally, a genuine dispute exists as to whether the statement in the maintenance manual created an express warranty. Massachusetts law, however, bars Colgan's claims for strict liability, and we affirm the district court's ruling on this single issue. Finally, because the district court did not make an alternative ruling on Colgan's claims for negligence and breach of implied warranties, and because the merits of those claims are unchallenged on appeal, our ruling today leaves these claims for consideration on remand.

Accordingly, the order of the district court is affirmed in part,

vacated in part, and remanded for further proceedings consistent with this opinion.[4]

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

---

[4]We note Colgan also moved for summary judgment before the district court, although the district court's ruling on Colgan's motion has not specifically been argued to this Court. Nonetheless, because a genuine issue of triable fact exists on those claims, we decline to reverse the district court's decision denying Colgan's summary judgment motion.