SECOND DIVISION

No. 1-09-0148

| | | |
|---|---|---|
| SOUTH SIDE TRUST AND SAVINGS BANK OF PEORIA, as personal representative of the Estates of Christine Marie White, deceased, and John Michel White, deceased, | ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| MITSUBISHI HEAVY INDUSTRIES, LTD, a Corporation, MITSUBISHI HEAVY INDUSTRIES AMERICA, INC., a Corporation, HONEYWELL INTERNATIONAL, INC., a Corporation, WOODWARD GOVERNOR COMPANY, a Corporation, and AIR 1ST AVIATION COMPANIES, a Corporation, | ) ) ) ) ) ) ) ) ) | |
| Defendants-Appellees | ) ) ) | |
| (Stan Blaylock and Wayne Bates, | ) ) | Honorable Dennis J. Burke, |
| Defendants). | ) | Judge Presiding. |

JUSTICE KARNEZIS delivered the opinion of the court:

Plaintiff, South Side Trust and Savings Bank of Peoria, is the personal

representative of the estates of Christine Marie White (Christine) and John Michael

White (Michael). Christine and John were killed when the small plane owned and piloted by Michael crashed in New Mexico. Plaintiff filed an action in the circuit court of Cook County asserting product liability and negligence claims against the manufacturers and sellers of the plane and its component parts, Mitsubishi Heavy Industries, Ltd. (Mitsubishi), Mitsubishi Heavy Industries America, Inc. (Mitsubishi America), Honeywell International, Inc. (Honeywell), Woodward Governor Company (Woodward) and Air 1st Aviation Companies (Air 1st) (collectively defendants), and breach of warranty claims against Air 1st.[1] The court dismissed plaintiff's product liability claims against Air 1st and granted summary judgment to defendants on all remaining claims. On appeal, plaintiff argues the court erred in dismissing plaintiff's claims and/or granting summary judgment to defendants. It asserts the court erred in (1) misapplying section 2-621 of the Illinois Code of Civil Procedure (735 ILCS 5/2-621 (West 1994))[2], Federal Aviation Administration section 91.403(a) (14 C.F.R. §91.403(a)

---

[1] Plaintiff also filed negligence claims against flight instructors Stan Blaylock and Wayne Bates but those claims are not at issue here.

[2] Public Act 89-7 amended section 2-621 (Pub. Act 89-7, eff. March 9, 1995 (amending 735 ILCS 5/2-621 (West 1994)). However, in *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 689 N.E.2d 1057 (1997), our supreme court, held the act unconstitutional in its entirety. Accordingly, the version of section 2-621 that was in effect before the 1995 amendment is applicable to this case.

(2006)) and the facts to plaintiff's claims against Air 1st and (2) finding the 18-year statute of repose provided by the General Aviation Revitalization Act of 1994 (49 U.S.C. §40101 note (2000)) (GARA) applicable to its claims against the other defendants.  We affirm in part, reverse in part and dismiss in part.

BACKGROUND

Michael and Christine were killed on June 10, 2001, when their plane, a model MU-2B-20 passenger aircraft piloted by Michael, crashed in New Mexico.  Mitsubishi, a Japanese corporation, manufactured the fuselage and frame of the plane.  In 1969, it delivered those components to its subsidiary, Mitsubishi Aircraft International (MAI), in Texas so that the plane could be assembled and the other components of the plane, such as the engines and the interior, could be installed.  In 1970, MAI sold the plane to its first purchaser.  In 1988, fuel control units and propellor governors manufactured by Woodward were installed in the plane, replacing existing parts.  In October 1994, Honeywell, the successor to the manufacturer of the plane's engines and parts of the power plant control system in the plane, revised the engine maintenance manual and distributed the revisions.

Air 1st bought the plane in 1998 and registered it with the Federal Aviation Administration (FAA).  Because Air 1st is not a maintenance facility, it contracted with Epps Aviation (Epps) to update the planes records, to do a logbook search and determine maintenance or certification issues.  Once Epps finished, Air 1st ferried the plane to Intercontinental Jet (Intercontinental) in order that Intercontinental could

3

perform the work necessary to obtain a U.S. certificate of airworthiness. Intercontinental was to make sure the plane met all the requirements of the manufacturer's service bulletins, research all the logbooks and perform inspections to verify the plane met the specifications in the type certificate for the aircraft. Intercontinental returned the plane to Air 1st in January 1999, having certified the plane as meeting the FAA's airworthiness requirements. The plane was recertified in January 2000. Air 1st sold the plane but subsequently regained title. Air 1st sold the plane to Michael in April 2000. The crash occurred two months later.

In February 2003, plaintiffs filed a wrongful death and survival action in Cook County against Mitsubishi; Mitsubishi America, the company which provides customer support for operators of MU-2 type aircraft in the United States; Honeywell; and Woodward. Plaintiff subsequently added Air 1st as a defendant. Plaintiff's fourth amended complaint charged that defendants manufactured and sold a defective and unreasonably dangerous product containing defective and unreasonably dangerous parts and they failed to provide adequate warnings and instructions regarding the plane's fuel control unit, the idiosyncracies of which allegedly led to the crash.

The court dismissed the two product liability counts against Air 1st pursuant to section 2-621 of the Code and granted summary judgment to Air 1st on the negligence and breach of warranty claims against it. The court granted summary judgment to Mitsubishi, Mitsubishi America, Honeywell and Woodward pursuant to GARA's 18-year statute of repose. GARA is an 18-year statute of repose that protects manufacturers of

"general aviation aircraft"[3] and of new components, parts or systems of such aircraft from liability for accidents that arise more than 18 years after the date a new aircraft is delivered to its first purchaser. 49 U.S.C. §40101 note, §2(a)(1)(A) (2006). The 18-year period of repose restarts with regard to the manufacturer of a new component, part or system when that component, part or system is installed in a general aviation aircraft. 49 U.S.C. §40101 note, §2(a)(2) (2006). The statute of repose does not apply if a plaintiff can plead and prove that a manufacturer "knowingly misrepresented to the [FAA], or concealed or withheld from the [FAA], required information that is material and relevant" to the performance and maintenance of a general aviation aircraft or part thereof and the information "is causally related" to the harm plaintiff allegedly suffered. 49 U.S.C. §40101 note, §2(b) (2006).

The court found the plane was a "general aviation aircraft" within the meaning of GARA. Pursuant to GARA, the statute of repose on liability would expire in 1988, 18 years after the plane was delivered to its first purchaser in 1970. Plaintiff's suit was for an accident that happened in 2001, more than 13 years after the end of the repose

---

[3] A "general aviation aircraft" is any aircraft for which the FAA has issued a type or airworthiness certificate; has a maximum seating capacity of 20 passengers at the time the FAA issues the certificate; and is not engaged in "scheduled" passenger carrying activity at the time of the accident. General Aviation Revitalization Act of 1994, Pub. L. 105-102, §3(e), 111 Stat. 2216 (amended 1997).

period and, accordingly, the end of the manufacturers' liability. The court, therefore, granted summary judgment to Mitsubishi, the plane's Japanese manufacturer, finding that GARA applies to a foreign manufacturer and plaintiff presented no evidence that Mitsubishi knowingly misrepresented to or concealed material information from the FAA such that the "knowing misrepresentation exception" to the repose period applied.

The court granted summary judgment to Mitsubishi America, finding that Mitsubishi America qualified as a manufacturer under GARA and was, therefore, entitled to its protections. The court granted summary judgment to Woodward, finding the 1988 installation of the parts manufactured by Woodward did not restart the 18-year repose period because plaintiff failed to present any evidence that those parts caused the accident. Lastly, the court granted summary judgment to Honeywell, finding that the revised engine maintenance manual distributed by Honeywell in 1994 did not constitute a new "part of the aircraft" such that its distribution caused the statute of repose to restart at that time. Plaintiff timely appealed the court's order.

Analysis

Air 1st Aviation

a. Dismissal Pursuant to Section 2-621

The court granted dismissal of plaintiff's strict liability claims against Air 1st pursuant to section 2-621 of the Code. Section 2-621, also known as the Illinois distributor statute or the "seller's exception," provides that a nonmanufacturer defendant, usually a distributor or retailer, in a strict product liability action may be

6

dismissed from the action if it certifies the correct identity of the manufacturer of the product which allegedly caused the injury.  735 ILCS 5/2-621 (West 1994); *Murphy v. Mancari's Chrysler Plymouth, Inc.*, 381 Ill. App. 3d  768, 770, 887 N.E.2d 569, 573 (2008).  As soon as the plaintiff has filed against the product manufacturer and the manufacturer has answered or otherwise pleaded, the court must dismiss the strict liability claim against the certifying defendant(s), except where the plaintiff shows the defendant participated in the design and manufacturer of the allegedly defective product, had actual knowledge of the defect in the product or created the defect. *Murphy*, 381 Ill. App. 3d  at 770-71, 887 N.E.2d at 573; 735 ILCS 5/2-621(b), (c) (West 1994).

Pursuant to section 2-621(b), a plaintiff may move at any time for reinstatement of a defendant previously dismissed pursuant to section 2-621 if an action against the product manufacturer would be impossible or unavailing.  735 ILCS 5/2-621(b) (West 1994); *Murphy*, 381 Ill. App. 3d  at 771, 887 N.E.2d at 573.  Section 2-621(b) provides in relevant part:

"The plaintiff may at any time subsequent to the dismissal move to vacate the order of dismissal and reinstate the certifying defendant or defendants, provided plaintiff can show one or more of the following:

(1) That the applicable period of statute of limitation or statute of repose bars the assertion of a strict liability in tort cause of action against the

manufacturer or manufacturers of the product allegedly causing the injury, death or damage." 735 ILCS 5/2-621(b)(1) (West 1994).

Air 1st moved to dismiss plaintiff's strict liability claims pursuant to section 2-621 on the basis that it was not the manufacturer or designer of the plane or its parts, the manufacturers had been identified and plaintiff had filed suit against the manufacturers. There is no question that Air 1st complied with the requirements of section 2-621. Plaintiff opposed the motion pursuant to sections 2-621(c)(2) and (c)(3), asserting that Air 1st had knowledge or created the defect which caused the Whites' deaths. Plaintiff also raised the section 2-621(b)(1) reinstatement provision, asserting that, if the court granted summary judgment to the manufacturer defendants (Mitsubishi, Mitsubishi America, Woodward and Honeywell) pursuant to GARA, a statute of repose, its strict liability claims against Air 1st could be vacated and the claims reinstated pursuant to section 2-621(b). The court's written order granted Air 1st's motion to dismiss "with prejudice pursuant to section 2-621." The court stated it "did not consider the applicability of section 2-621 in light of the rulings on the manufacturers' motions." Plaintiff appealed the court's order.

We have no jurisdiction to consider the court's order dismissing plaintiff's strict liability claims against Air 1st pursuant to section 2-621. Dismissal of a defendant pursuant to section 2-621 is not a final appealable order because "[a] dismissal under section 2-621 does not dispose of the rights of the parties." *Kellerman v. Crowe*, 119

Ill. 2d 111, 115-16, 518 N.E.2d 116, 118 (1987). As the provisions of section 2-621(b) show, the statute "clearly contemplates the possibility of further action." *Kellerman*, 119 Ill. 2d at 116, 518 N.E.2d at 118. Under the circumstances prescribed in section 2-621(b), a plaintiff may move at any time for the reinstatement of a defendant who was previously dismissed under the statute. *Kellerman*, 119 Ill. 2d at 116, 518 N.E.2d at 118. Accordingly, until such occurs, and the motion is decided by the court, a dismissal pursuant to section 2-621 is not final and appealable.

Here, after the court barred plaintiff's strict liability claims against the manufacturers pursuant to the GARA statute of repose, plaintiff did not move to vacate the dismissal of its claims against Air 1st and seek reinstatement of those claims. Granted, plaintiff raised the possible reinstatement of its claims pursuant to section 2-621(b)(1) in its responses to Air 1st's motion to dismiss. But it did so prior to the court's decision on its claims against the manufacturers; the court's order specifically stated the court did not consider whether section 2-621 applied in light of its rulings on the manufacturers' motions; and plaintiff did not move pursuant to section 2-621(b)(1) or renew its previous argument after the court did enter judgment for the manufacturers. Until plaintiff files and the court rules on a motion for vacation of the order dismissing plaintiff's strict liability claims against Air 1st and reinstatement of those claims pursuant to section 2-621(b), we have no jurisdiction to consider the court's dismissal of those claims.

b. Summary Judgment on Negligence Count

9

The court granted summary judgment to Air 1st on plaintiff's negligence counts. Plaintiff had charged Air 1st was a corporation, sold the accident aircraft to Michael and, upon the sale, "it then and there became and was the duty of [Air 1st] to exercise reasonable care in its conduct so as not to cause injury to *** plaintiff's decedents." Plaintiff asserted Air 1st breached that duty when it negligently and carelessly sold the aircraft (1) without "proper and adequate" instructions and warnings regarding the "proper setting of the engine flight idle fuel flow settings" and "proper propellor rigging"; (2) "when said aircraft had not been properly maintained, repaired and/or overhauled"; (3) "without current and proper manuals (e.g. instructions in use)"; and (4) in a defective and unreasonably dangerous condition." Air 1st moved for summary judgment, arguing that, as a prior owner of the aircraft, it owed no duty to plaintiff or its decedents to maintain the plane in airworthy condition at the time of the accident. It also asserted, in the alternative, that pursuant to FAA sections 91.403(a) and 91.405 (14 C.F.R. §§91.403(a), 91.405 (2006)), it was not liable for negligence because it delegated its duty to ensure the airworthiness of the aircraft to FAA-qualified mechanics at Epps and Intercontinental.

The FAA promulgates regulations imposing certain duties on owners of aircraft to endure the safety of others. *Jarmuth v. Aldridge*, 321 Ill. App. 3d 690, 692, 747 N.E.2d 1014, 1017 (2001). To that end, section 91.403(a) provides:

"The owner or operator of an aircraft is primarily responsible for maintaining that aircraft in airworthy condition, including compliance with part 39

10

[airworthiness directives] of this chapter."  14 C.F.R. § 91.403(a) (2006).

Similarly, section 91.405 provides:

"Each owner or operator of an aircraft --

(a) Shall have that aircraft inspected as prescribed in subpart E of this

part and shall between required inspections, except as provided in paragraph (c)

of this section, have discrepancies repaired as prescribed in part 43 of this

chapter."  14 C.F.R. § 91.405(a) (2006).

Pursuant to sections 91.403 and 91.405, a "non commercial aircraft owner[]" may

delegate its "duty to ensure the safety of a privately owned aircraft" to FAA-qualified

mechanics and inspectors and cannot be held liable for breach of that duty unless it

knew or should have known of a problem or defect left unrepaired.  *Jarmuth*, 321 Ill.

App. 3d  at  693-94, 747 N.E.2d at 1018-19.

Applying sections 91.403(a) and 91.405 to the undisputed facts, the court held

that Air 1st had a duty to maintain the accident aircraft in an airworthy condition and

had delegated that duty to Intercontinental Jet in compliance with section 91.403, thus

discharging its duty; and, given the lack of evidence that Air 1st knew or should have

known of a defect or deficiency left unrepaired, was not liable for any violation of its

maintenance duty.  It granted summary judgment to Air 1st.  Plaintiff argues the court

erred in applying sections 91.403 and 91.405 because its claims are not negligent

maintenance claims against the previous owner of an aircraft but, instead, are product

liability negligence claims against a previous owner who happens to be a commercial

refurbisher and reseller of planes and that it sued Air 1st as a seller, not as an owner.

Summary judgment is appropriate if "the pleadings, depositions, and admissions on file, with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008); *Willett v. Cessna Aircraft Co.*, 366 Ill. App. 3d 360, 368, 851 N.E.2d 626, 633 (2006). It should only be granted if, after construing the pleadings, depositions, admissions, and affidavits strictly against the movant and liberally in favor of the opponent, no genuine issue as to any material fact is found and the right of the moving party is clear and free from doubt. *Willett*, 366 Ill. App. 3d at 368, 851 N.E.2d at 633. Reviewing the court's grant of summary judgment *de novo* (*Willett*, 366 Ill. App. 3d at 368, 851 N.E.2d at 633), we find the court erred in granting summary judgment to Air 1st on the basis of sections 91.403 and 91.405.

It is uncontested that Air 1st is a corporation in the business of buying and selling planes; advertises that it specializes in the Model MU-2; buys planes for its own account; has the planes inspected, refurbished and maintained in order to meet the requirements of service bulletins and federal airworthiness directives; sells the planes once they have passed inspection and are airworthy; is not a maintenance facility; delegates the inspection and maintenance of the planes to assorted maintenance facilities; searched out and bought the accident aircraft in 1998 for the purpose of resale; delegated the inspection and maintenance of the accident aircraft to Intercontinental; sold the accident aircraft in 1999; reacquired it in 2000; and sold it to

Michael in 2001. As we found in our previous opinion in this case (*Commerce Trust Co. v. Air 1st Aviation Cos.,* 366 Ill. App. 3d 135, 851 N.E.2d 133 (2006) (in the context of Air 1st's motion to dismiss for lack of personal jurisdiction)), plaintiff's cause of action lies in the wake of Air 1st's commercial activities. There is no question that plaintiff's negligence claims are directed to Air 1st as the commercial seller of the aircraft, not against it as an owner, whether past or present.

Sections 91.403(a) and 91.405[4] have no application in the context of plaintiff's claims against Air 1st. As the clear language of the sections shows, the responsibility for maintaining the airworthiness of an aircraft lies with the "owner" of the aircraft, *i.e.,* the current owner rather than the past owner. See *Tanner v. Rebel Aviation, Inc.*, 146 Ga. App. 110, 113, 245 S.E.2d 463, 465 (1978) (court held section 91.403(a), formerly

---

[4] "When considering [section 91.403(a), formerly known as 14 CFR § 91.163], together with all of the other regulations pertaining to the maintenance of aircraft it appears that the purpose of the regulations is to ' . . . promote air safety and protect the lives of pilots, passengers, and persons on the ground.' [Citation.] Thus, it is obvious that the Federal Aviation Regulations do not establish commercial warranties, but seek to protect the safety of the general public. *** [A] subsequent owner of [an] aircraft[ ] is not within the class of people protected by this rule." *Tanner v. Rebel Aviation, Inc.*, 146 Ga. App. 110, 113, 245 S.E.2d 463, 465 (1978), quoting *French v. C. A. B.*, 378 F.2d 468, 471 (10th Cir. 1967).

14 C.F.R. §91.163, did not provide current owner of aircraft with cause of action against past owner of aircraft for failure to maintain aircraft in airworthy condition pursuant to section 91.403(a) duty). Further, the sections contain no indication that they impose a continuing duty to maintain on past owners of the aircraft.

At the time of the accident, Michael was the owner of the aircraft. Air 1st was the previous owner. Air 1st's duty to maintain the plane pursuant to sections 91.403(a) and 91.405, if any, ceased when it sold the plane to Michael, when it gave up its ownership. As of the date Michael became the owner of the aircraft, he had the duty to maintain the plane, not Air 1st. In addition, plaintiff is claiming against Air 1st as the seller of the plane, not as the owner of the plane. Granted, Air 1st fills both the role of commercial seller and former owner of the plane, but plaintiff's claims are solely directed to Air 1st's actions as a seller. Sections 91.403(a) and 91.405 have no place in an action filed against anyone other than the then-current owner of an aircraft. The court erred in finding otherwise here and in granting summary judgment to Air 1st on that basis. Further, although we may affirm the court on any basis found in the record (*Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 641, 784 N.E.2d 258, 265 (2002)), we find no other basis here for a grant of summary judgment to Air 1st on plaintiff's negligence claims.

In order to establish a cause of action for negligence, a plaintiff must show the following elements: the existence of a legal duty owed by the defendant to the plaintiff; breach of that duty; a resulting compensable injury to the plaintiff; and the breach was

the proximate cause of the injury. *Miller v. Dvornik*, 149 Ill. App. 3d 883, 891, 501 N.E.2d 160, 166 (1986). To that end, plaintiff's complaint charged that when Air 1st sold the plane to Michael, "it then and there became and was the duty of [Air 1st] to exercise reasonable care in its conduct so as not to cause injury to the person of the plaintiff's decedents, and each of them." Plaintiff asserted Air 1st breached "its duty of care to the plaintiff's decedents" when it negligently and carelessly sold the aircraft without "proper and adequate" instructions and warnings regarding certain components, proper maintenance and repair, current manuals and "in a defective and unreasonably dangerous condition."

Plaintiff's complaint clearly conveys that Air 1st's duty of care arose from its actions as the seller of the plane. There is no question that liability for a defective product can be imposed on a seller in the business of placing products in the stream of commerce, especially where, as here, a contract for the sale of goods exists. The majority of Air 1st's argument below, however, was directed to asserting it had no duty as a past owner pursuant to sections 91.403(a) and 91.405 rather than asserting it had no duty as a seller, *i.e.*, addressing the argument plaintiff actually made. The only other basis for summary judgment presented by Air 1st was its cursory assertion that plaintiff's complaint presented insufficient facts from which the court could infer that Air 1st had a legal duty of care toward the Whites or what the scope of that duty was. As noted, the complaint was more than sufficient to show Air 1st's alleged duty of care toward plaintiff and its decedents arose from Air 1st's actions as a seller in the

business of placing products in the stream of commerce.  Defendant presented no evidence showing it had no duty as a seller or that it complied with its duty as a seller. Defendant did not support its motion for summary judgment with evidentiary facts and plaintiff may, therefore, rely on its complaint to establish a genuine issue of fact. *Kielbasa v. St. Mary of Nazareth Hospital*, 209 Ill. App. 3d  401, 406, 568 N.E.2d 208, 211 (1991).  We reverse the grant of summary judgment to Air 1st on plaintiff's negligence counts.

### c. Summary Judgment on Breach of Implied Warranty Count

The court granted summary judgment to Air 1st on plaintiff's breach of implied warranty claims against Air 1st.  Plaintiff alleged Air 1st "expressly and/or impliedly warranted and represented that the subject aircraft, including its instructions and warnings, was airworthy, of merchantable quality, fit and safe for the purpose for which it was designed, *** sold, serviced, *** intended and used, and *** was free from defects" and that Air 1st breached said warranties for assorted reasons as previously set forth.  Air 1st moved for summary judgment, asserting there was no evidence to show the aircraft was not airworthy when Air 1st sold it to Michael and that the deposition of Zipper Robbins, Air 1st's president in 1998, shows he/Air 1st made no promises or warranties to Michael about the airworthiness of the aircraft when he sold it to Michael.  Finding no evidence that Air 1st "expressly and/or impliedly warranted and represented that the subject aircraft, including its instructions and warnings, was airworthy," and noting its previous finding that Air 1st properly delegated any and all of

16

its duties to maintain the aircraft to Intercontinental, the court granted summary judgment to Air 1st.

Plaintiff argues the court erred in considering the fact that Air 1st delegated its maintenance duties to Intercontinental and in failing to find the existence of an implied warranty of fitness for a particular purpose. Given our previous conclusion that the court erred in applying sections 91.403(a) and 91.405, we agree that the court should not have considered the fact that Air 1st delegated its duty to maintain the airworthiness of the aircraft to another party. Indeed, we do not see how the delegation of this duty is relevant to whether there existed an implied warranty between Air 1st and Michael and whether Air 1st breached that warranty.

Further, it was not plaintiff's burden at the summary judgment stage to prove its assertions where Air 1st did not provide evidentiary support for its motion for summary judgment. *Kielbasa*, 209 Ill. App. 3d at 406, 568 N.E.2d at 211. It is uncontested that there was a contract between Air 1st and Michael for the sale of the plane and that the contract provided no express warranty for the plane. Plaintiff, however, pled the existence of an implied warranty of fitness for a particular purpose arising from the sale. In order to show the existence and breach of an implied warranty of fitness for particular purpose, a plaintiff must show "(1) a sale of goods, (2) that the seller had reason to know of any particular purpose for which the goods are required, (3) that plaintiff, as buyer of the goods, was relying upon seller's skills or judgment to select suitable goods, and (4) that the goods were not fit for the particular purpose for which

17

they were used." *Maldonado v. Creative Woodworking Concepts, Inc.*, 342 Ill. App. 3d 1028, 1034, 796 N.E.2d 662, 666 (2003).

Plaintiff showed a sale of the aircraft and Michael's particular purpose for the aircraft is obvious: to fly it and travel safely in it. The aircraft arguably was not fit for that purpose because it crashed. Air 1st moved for summary judgment on the basis that Robbins' testimony shows he made Michael no promises regarding the airworthiness of the aircraft and plaintiff failed to show the plane was not airworthy when sold to Michael. This evidence, Robbins' testimony that he made no promises to Michael, was solely directed to negating the existence of an express warranty. But plaintiff had asserted the existence of both an express warranty and of an implied warranty. Air 1st presented no evidence negating the existence of an implied warranty, such as testimony that the plane was airworthy when sold to Michael or that Michael did not rely on Air 1st's judgment in selecting the plane. Air 1st contested the existence of an implied warranty by asserting that plaintiff's presented no evidence that the plane was not airworthy. That is not plaintiff's burden at this stage. Only in the face of evidence negating the existence of an implied warranty of fitness for a particular purpose would plaintiff be required to provide evidentiary material in support of its complaint. The burden was on Air 1st to support its argument that there was no implied warranty of fitness for a particular purpose with evidentiary facts. It failed to do so. The court erred in granting summary judgment to Air 1st on plaintiff's breach of implied warranty of fitness for a particular purpose counts.

18

Woodward Governor

The court granted summary judgment to Woodward, finding that the 18-year statute of repose provided by GARA protected Woodward from liability in plaintiff's suit. There being only one case in Illinois addressing the application of GARA[5], we will refer to other jurisdictions for guidance.

GARA provides, in relevant part, as follows:

"(a) *** Except as provided in subsection (b), no civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred –

(1) after the applicable limitation period beginning on-

(A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or

(B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft; or

(2) with respect to any new component, system, subassembly, or other

---

[5]   *Willett v. Cessna Aircraft Co.*, 366 Ill. App. 3d 360, 851 N.E.2d 626 (2006).

19

part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition." 49 U.S.C. §40101 note, §2(a) (2006).

The GARA statute of repose does not apply for the following exceptions: (1) where the plaintiff proves the manufacturer knowingly misrepresented to the FAA or concealed or withheld from the FAA required information material to the performance or maintenance of the aircraft or part that is causally related to the injury; (2) for injury to a passenger traveling on the plane for purposes of medical treatment or other emergency; (3) for injury to a person who was not on board the plane at the time of the accident; and (4) for a claim brought under a written warranty enforceable under the law except for the operation of GARA. 49 U.S.C. §40101 note, §2(b) (2006).

The applicable "limitation period" is "18 years with respect to general aviation aircraft and the components, systems, subassemblies, and other parts of such aircraft." 49 U.S.C. §40101 note, §3(3) (2006). Pursuant to GARA section 2(a)(2), referred to as the "rolling provision," the 18-year repose period can restart when a new part or component is installed in a general aviation aircraft as against the manufacturer of that replacement part. *Moyer v. Teledyne Continental Motors*, 2009 Pa. Super. 124, ¶ 7. The rolling provision applies if the plaintiff can show that a new item replaced an item either originally in the aircraft or added to the aircraft and the new item was also a

cause of the claimed damages. *Hiser v. Bell Helicopter Textron Inc.*, 111 Cal. App. 4th 640, 650, 4 Cal. Rptr. 3d 249, 257 (2003). The repose period restarts only for the newly installed part. *Hiser*, 111 Cal. App. 4th at 650, 4 Cal. Rptr. 3d at 257.

A defendant has the burden of proof in showing that an affirmative defense such as a statute of repose applies. *Willett*, 366 Ill. App. 3d at 371, 851 N.E.2d at 635. If a defendant makes a showing that the statute of repose applies, then the plaintiff has the burden to show facts that operate to toll or create an exception to the repose period. *Willett*, 366 Ill. App. 3d at 371, 851 N.E.2d at 635-36. It is uncontested that: Michael's plane was the type of general aviation aircraft covered by GARA; the plane was sold to its first user in 1970; the 18-year GARA repose period would start at the time of that sale and expire in 1988; and the accident occurred in 2001, more than 30 years after the plane was first sold and well beyond the 18-year repose period. Accordingly, a manufacturer of the plane or a part thereof would be protected from plaintiff's suit unless it manufactured new parts which were installed in the plane within 18 years of the accident or one of the four exceptions applied. 49 U.S.C. §40101 note, §§2(a)(1)(A), (a)(2), (b) (2006). Woodward was the manufacturer of two fuel control units and two propeller governors in the plane when it crashed. Arguably, therefore, it would be protected from plaintiff's suit under GARA.

Plaintiff's first amended complaint stated strict liability and negligence counts against Woodward. The complaint asserted the plane contained fuel control units and a "propellor synchrophaser" manufactured by Woodward; one of the fuel control units

21

and/or the synchrophaser was a cause of the crash; and the action was not subject to GARA because the two components were manufactured and installed within the GARA repose period.

Woodward moved for summary judgment, asserting that GARA barred any claims against it because "[a]ll the Woodward components alleged to have caused the accident were manufactured more than eighteen years prior to the accident." It asserted that it had manufactured and delivered the two fuel control units to the manufacturer of the engine in the plane in 1968 and 1969 and, at the time of the crash, those components had been in operation over 30 years. Woodward pointed out that, contrary to the assertion in plaintiff's complaint, the plane did not contain a "synchrophaser" system. Instead it contained two propellor governors corresponding to a "synchronizer" system. Woodward asserted it had manufactured and delivered "the last synchronizers" in 1979.[6] Woodward attached the affidavit of Steven Krugler, a senior engineer at Woodward responsible for accident investigation. Krugler stated he had examined the wreckage, identified the Woodward parts therein, traced available serial numbers and determined the fuel control units were delivered and manufactured in 1968 and 1969 and the last propellor governor/synchronizer system was

---

[6] Plaintiff corrected its allegations to show the Woodward parts at issue included propellor governors and not propellor synchrophasers in its fourth amended complaint.

22

manufactured and delivered in 1979.

Plaintiff responded to the motion for summary judgment by arguing that the 18-year repose period pertaining to Woodward restarted in 1988 for the fuel control units and in 1999 for the propellor governors because the fuel control units in the plane were reconditioned with new parts in 1988 and the propellor governors were newly installed in 1999; the parts were either new or refurbished with new parts when installed; and the parts were alleged to be a proximate cause of the crash. As a result, the 2001 accident would fall within the restarted period running from 1988 to 2006 for the fuel control units and 1999 to 2017 for the propellor governors and plaintiff's suit against Woodward would not be barred.

Plaintiff supported its assertion that the parts were new and/or refurbished when installed in 1988 and 1999 with the affidavit of its expert, William Mermelstein, an FAA-licensed mechanic with airframe and powerplants ratings and qualified by the FAA as a designated maintenance examiner and manufacturers inspection representative. Mermelstein testified that in 1988 the fuel control unit had been repaired and parts therein replaced with new parts. He also stated the propellor governor had been assembled in January 1999; it could not, therefore, have been put into the plane before 1999; and it was probably installed in the plane by Intercontinental in 1999.

Plaintiff's response stated that its complaints had consistently charged that the defective condition of Woodward's parts caused the crash. It noted that, from the then-current pleadings, it appeared "Woodward seeks judgment based solely on the

23

passage of GARA's initial 18-year from date of sale repose period."  Plaintiff stated:

> "Whether Woodward will contest causation based on plaintiff's charges is
> undetermined on the papers presently before this Court.  In response, plaintiff
> refers the Court to the testimony of Woodward's Krugler who testified 'you would
> have to have both a fuel control and a prop governor failure for it to affect the
> NTS system,' NTS referring to negative torque sensing mode.  NTS has been
> acknowledged by [Mitsubishi] as a condition which can 'result in unsafe flight
> characteristics.' "

It then concluded that "the question of causation is adequately established  for
purposes of this motion."

In Woodward's reply to plaintiff's response, it did not contest plaintiff's allegation
that the parts were new or refurbished with new parts or Mermelstein's support of those
allegations.  It agreed there was no doubt the propellor governors was installed in 1999
and the fuel control units were reconditioned in 1988.  Instead, Woodward asserted
plaintiff's "problem" was that Mermelstein's affidavit did not say "what is required by the
exception to the GARA repose period -- the GARA-exempt parts caused the crash,"
that plaintiff's expert "refused to back up" plaintiff's theory of the case with his opinions
as to causation.

The court granted summary judgment to Woodward.  Although it found plaintiff
sufficiently showed the relevant fuel control unit and propellor governor were "new"
parts, it held that plaintiff failed to present evidence to support its allegation that the

fuel control unit and/or propeller governor caused the accident because Mermelstein's affidavit was insufficient to support plaintiff's allegation that the right fuel control unit and propeller governor caused the accident. The court, therefore, determined that the 18-year statute of repose did not restart when the fuel control unit and propellor governor were installed in the plane and plaintiff was barred from seeking recovery from Woodward.

Neither party contests the court's finding that the fuel control unit and propellor governor were "new" when installed in the plane. The issue is whether plaintiff sufficiently supported its allegation that the fuel control unit and propellor governor caused the accident to survive the motion for summary judgment. Plaintiff asserts the court erred in (1) considering Woodward's argument regarding plaintiff's failure to show proximate cause because Woodward did not raise that argument in its motion for summary judgment, only in its reply to plaintiff's response to the motion for summary judgment and (2) finding that Mermelstein's affidavit was insufficient, in direct disregard of plaintiff's allegations in its complaint and Mermelstein's statement in his affidavit that the term "powerplant control system components" (which caused the crash) includes Woodward's fuel control units and propeller governors.

Plaintiff is correct that Woodward only raised a single issue in its motion for summary judgment: that GARA did not restart because the fuel control units and propellor governors had been in service more than 18 years before the crash and, therefore, not new when installed in the plane. Plaintiff states it, therefore, conducted

25

discovery directed to the issue of whether the parts were new when installed and specifically replied to the argument by providing evidence that the parts were new when installed. Although plaintiff made a brief mention of proximate cause in its response, it did not directly respond to any argument by Woodward contesting proximate cause because Woodward had not made such an argument. Only after plaintiff filed its response to the motion for summary judgment showing that the parts were new when installed during the 18-year repose period did Woodward raise the issue of proximate cause in its reply. Plaintiff argues it had no opportunity to address the issue of proximate cause because the issue was not at bar when it filed its response. It had presented Mermelstein's affidavit for the sole purpose of combating Woodward's single contention that new parts were not inserted into the plane.

Woodward having asserted the affirmative defense of the GARA statute of repose, it was plaintiff's burden to show facts tolling or creating an exception to GARA. To that end, plaintiff asserted the 18-year period restarted because the Woodward parts were installed during the repose period. In order to show GARA restarted, plaintiff would have to show the parts were (1) new when installed and (2) alleged to have caused the crash. Plaintiff, as the burdened party, presented evidence to support both those elements. Granted, because Woodward did not contest causation in its motion for summary judgment, plaintiff presented only a bare minimum of evidence supporting its allegation that Woodward's parts caused the accident, but it did present some support.

Woodward, in its response, did not present any evidence to show that the parts did not cause the crash, *i.e.*, rebut plaintiff's allegation and evidence that the parts did cause the crash. It did not present an expert saying the parts were not at fault. Instead, it argued that Mermelstein's affidavit was insufficient to show causation. Plaintiff did not have to prove its case at the summary judgment stage. Where a defendant does not support its motion for summary judgment with evidentiary facts, the plaintiff may rely on its complaint to establish a genuine issue of fact. *Kielbasa v. St. Mary of Nazareth Hospital*, 209 Ill. App. 3d 401, 406, 568 N.E.2d 208, 211 (1991). In the absence of evidentiary material from Woodward that the parts did not cause the crash, plaintiff did not have to present an expert saying that the parts did cause the crash to oppose the motion for summary judgment. *Kielbasa*, 209 Ill. App. 3d at 406, 568 N.E.2d at 211. The court erred in granting summary judgment to Woodward because a question of fact existed regarding whether the Woodward parts caused the accident.

Honeywell

The court granted summary judgment to Honeywell, finding the GARA statute of repose applied to bar plaintiff's suit against Honeywell. It is uncontested that Honeywell is the successor manufacturer of the plane's engines, originally installed in the plane in 1980, and that none of the GARA exceptions apply to Honeywell. Honeywell is, therefore, protected from plaintiff's suit unless it manufactured new parts which were installed in the plane within 18 years of the accident. Plaintiff asserts that

Honeywell did install such new parts when it issued a revised engine maintenance manual in October 1994 and that the statute of repose restarted at that time. Plaintiff's argument is that an aircraft maintenance manual is a "new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft" under section 2(a)(2).

Plaintiff is correct that a *flight* manual has been considered a "part" of a general aviation aircraft for GARA purposes. See *Caldwell v. Enstrom Helicopter Corp.*, 230 F.3d 1155 (9th Cir. 2000); *Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1220-21 (10th Cir. 1991). A flight manual is an integral part of every general aviation aircraft product that a manufacturer sells. *Caldwell*, 230 F.3d at 1157. It is not a separate, general instructional guide but a guide specific to the type of aircraft, required by federal regulation to be on board every aircraft and containing the instructions necessary to operate the aircraft and used by the pilot. *Caldwell*, 230 F.3d at 1157. A flight manual "fits comfortably within the terminology and scope" of GARA section 2(a)(2). *Caldwell*, 230 F.3d at 1157.

A maintenance manual is not comparable to a flight manual and does not fit within the scope of GARA section 2(a)(2). *Moyer*, 2009 Pa. Super. 123 ¶14.; *Burton v. Twin Commander Aircraft, LLC.*, 148 Wash. App. 606, ___ P.3d ___ (2009).[7] Unlike a

___

[7] See also the following cases rejecting the argument that an aircraft maintenance manual is a "part" of an aircraft for GARA purposes: *Robinson v. Hartzell*

28

flight manual, a maintenance manual is not necessary to operate a plane. *Burton*, 148 Wash. App. at ___, 221 P.3d at 295, following *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270 (4th Cir. 2007) (determining whether a maintenance manual is "part" of an aircraft for purposes of warranty claims). It outlines procedures for servicing, troubleshooting and repairing aircraft and is used by a mechanic on the ground to service a plane, not by a pilot in the air to fly a plane. *Colgan Air, Inc.*, 507 F.3d at 276. Unlike a flight manual, a maintenance manual is not integral to safe operation of an aircraft. *Colgan Air, Inc.*, 507 F.3d at 277. It is not the sole means by which an aircraft operator can obtain airworthiness. *Colgan Air, Inc.*, 507 F.3d at 277.

Granted, federal regulations require that complete instructions for airworthiness be furnished to the owner of each type of aircraft and that those instructions must include an airplane maintenance manual describing the plane's features "to the extent

---

*Propeller Inc.*, 326 F. Supp. 2d 631 (E.D. Pa. 2004); *Alter v. Bell Helicopter Textron*, Inc., 944 F.Supp. 531 (S.D. Tex. 1996); *Carolina Industrial Products, Inc. v. Learjet, Inc.*, 189 F. Supp. 2d 1147 (D. Kan. 2001). All were decided in the context of "failure to warn" claims, finding that the plaintiffs were attempting to circumvent the GARA statute of repose by arguing that a manual or service bulletin issued within 18 years of an aircraft accident was defective, *i.e.*, the manual or bulletin failed to warn of or correct a design flaw, because the plaintiffs were precluded from suing for the flaw itself by expiration of the period of repose.

necessary for maintenance or preventive maintenance." 14 C.F.R. §§21.50(b), 23.1529, §23.2(a) (2006). But there is no federal regulation requiring that a maintenance manual be on board every plane or that a mechanic use only the methods prescribed in the current manufacturer's maintenance manual. *Colgan Air, Inc.*, 507 F.3d at 277. Instead, a mechanic may use the maintenance manual or instructions for continued airworthiness prepared by the manufacturer or " 'other methods, techniques and practices acceptable to the [FAA].' " (Emphasis omitted.) *Colgan Air, Inc.*, 507 F.3d at 277, quoting 14 C.F.R. §43.13 (2006). Because we do not consider a maintenance manual integral to the aircraft, a maintenance manual is not a "part" within the scope of GARA section 2(a)(2).

Our decision is reinforced by the fact that, if we did find that the statute of repose is triggered every time a manufacturer issues a service bulletin or an update to a maintenance manual, the intent of GARA would be eviscerated. *Moyer,* 2009 Pa. Super. 124, ¶ 9. GARA, a product liability statute of repose, was created

> " ' "to protect general aviation manufacturers from long-term liability in those instances where a particular aircraft has been in operation for a considerable number of years. A statute of repose is a legal recognition that, after an extended period of time, a product has demonstrated its safety and quality, and that it is not reasonable to hold a manufacturer legally responsible for an accident or injury occurring after that much time has elapsed." ' " *Burroughs v. Precision Airmotive Corp.*, 78 Cal. App. 4th 681, 689, 93 Cal. Rptr. 2d 124, 130

(2000), quoting *Altseimer v. Bell Helicopter Textron, Inc.*, 919 F. Supp. 340, 342 (E.D.Cal. 1996), quoting 140 Cong. Rec. H4998, H4999 (daily ed. June 27, 1994)(Statement of Representative Fish).

Congress determined that general aviation aircraft manufacturers and aircraft component manufacturers in the United States were facing a " 'precipitous' " decline because of the costs associated with defending product liability suits for alleged design and manufacturing defects. *Burroughs*, 78 Cal. App. 4th at 690, 93 Cal. Rptr. 2d at 131. The American manufacturers were subject to "long tail" tort liability, liability from the time an aircraft was sold until it was taken out of service many years later and concomitantly high product liability insurance rates and legal costs. *Burroughs*, 78 Cal. App. 4th at 690, 93 Cal. Rptr. 2d at 131. Congress determined that setting a time limit on liability was reasonable and necessary to free the manufacturers from the burdens imposed by the "long tail" liability while at the same time " 'affording fair treatment to persons injured in general aviation aircraft accidents.' " *Burroughs*, 78 Cal. App. 4th at 690, 93 Cal. Rptr. 2d at 131, quoting H.R. Rep. No. 103-525(I), at 1 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1638, 1638.

Congress's intent was that liability be cut off when a general aviation aircraft or component of such an aircraft is more than 18 years old. If we interpret GARA as requiring that the statute of repose restarts every time a new service bulletin or maintenance manual is issued for an aircraft or component that is more than 18 years old, that intent will be thwarted. Congress intended that liability start anew upon

installation of a new part affecting the safety of the aircraft (GARA section 2(a)(2)), not upon each issuance of an updated service guide for mechanics. The court did not err in granting summary judgment to Honeywell.

Mitsubishi Heavy Industries

The court granted summary judgment to Mitsubishi. Mitsubishi, the manufacturer of the major structural components of the plane, showed that it is protected from plaintiff's suit by GARA because the 2001 accident occurred more than 18 years after the plane it manufactured was sold to its first purchaser. Plaintiff asserts, however, that the court erred in granting summary judgment to Mitsubishi because (1) GARA does not apply to Mitsubishi because Mitsubishi is a Japanese manufacturer and Congress intended that GARA apply to only American manufacturers and (2) questions of fact exist regarding whether Mitsubishi knowingly misrepresented to the FAA or concealed or withheld from the FAA material information regarding improper fuel flow settings and propellor rigging which affected the controllability of the plane and led to the accident such that the exception to the statute of repose stated in GARA section 2(b)(1) applies to allow plaintiff's suit against Mitsubishi.

a. Foreign Manufacturers

The first question is whether GARA applies to a foreign manufacturer. The circuit court's interpretation of GARA is subject to *de novo* review. *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 603-04, 900 N.E.2d 1095, 1101 (2008). Our main objective in interpreting a statute is to determine and give effect to

the intent of the legislature in enacting it. *County of Du Page*, 231 Ill. 2d at 604, 900 N.E.2d at 1101. The best indicator of that intent is the statutory language, which should to be given its plain and ordinary meaning. *County of Du Page*, 231 Ill. 2d at 604, 900 N.E.2d at 1101. Words and phrases must be interpreted in light of other relevant provisions and the statute as a whole. *County of Du Page*, 231 Ill. 2d at 604, 900 N.E.2d at 1101. We may also consider the purpose behind the law, "the evils sought to be remedied," and the consequences of construing the statute one way or the other. *County of Du Page*, 231 Ill. 2d at 604, 900 N.E.2d at 1101. If a statute is capable of more than one reasonable interpretation, it is deemed ambiguous and we may consider extrinsic aids such as legislative history in our construction of the statute. *County of Du Page*, 231 Ill. 2d at 604, 900 N.E.2d at 1101.

Looking to the GARA language, nowhere does it specifically state that it is only to be applied to American manufacturers or that foreign manufacturers should be excluded from its protections and plaintiff does not assert otherwise. Instead, plaintiff asserts that a congressional intent to limit GARA's benefits to American manufacturers can be inferred from GARA's legislative history. There is no question that GARA was intended to reinvigorate the American general aviation aircraft industry. As plaintiff points out, the "purpose of the bill" introducing GARA states the bill "has been developed in response to a serious decline in the manufacture and sale of general aviation aircraft by Unites States companies." H.R. Rep. No. 103-525(I), at 1 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 1638, 1638. Further, as plaintiff's citations to

33

assorted congressional proclamations in favor of the bill show, the congressmen considered that their intent in passing the legislation was to "let us help American industry win" (140 Cong. Rec. S2452-02, S2464 (daily ed. March 8, 1994 (statement of Senator Dorgan)); "level the playing field between U.S. manufacturers of light aircraft versus our foreign competition" (140 Cong. Rec. S2995-01, S2996 (daily ed. March 8, 1994) (statement of Senator Simpson)); and offset the "phenomenal competitive advantage" foreign manufacturers of small aircraft enjoy over American manufacturers because of the "excessively burdensome liability laws" imposed upon American manufacturers (140 Cong. Rec. S2452-02, S2465 (daily ed. March 8, 1999) (statement of Senator Simpson)). But just because Congress intended GARA to reinvigorate the American small aircraft industry does not mean that Congress intended to do so to the detriment of foreign manufacturers.

Looking to GARA's plain language, it refers only to a "manufacturer" of "general aviation aircraft" and components. It does not define "manufacturer," let alone limit the term to cover only American manufacturers. It does define "general aviation aircraft," providing that a general aviation aircraft means "*any* aircraft" awarded a type certificate or certificate of airworthiness by the FAA, with a maximum seating capacity of 20 passenger and not engaged in scheduled passenger service at the time the accident. (Emphasis added.) 49 U.S.C. §40101 note, §2(c) (2006). So, a manufacturer of "any" aircraft or of a component of "any" aircraft meeting those requirements, *i.e.*, all the FAA requirements for issuance of a type certificate or airworthiness certificate as well as the

passenger and scheduling requirements of the GARA definition, is covered by GARA. This would necessarily mean that foreign manufacturers meeting those requirements are also protected by GARA. See, cited for its persuasive value, *LaHaye v. Galvin Flying Service, Inc.*, 144 Fed. Appx. 631 (9th Cir. 2005) (rejecting argument that GARA statute of repose does not apply to foreign manufacturers of general aviation aircraft), following *Lyon v. Agusta S.P.A.*, 252 F.3d 1078 (9th Cir. 2001) (applying the statute of repose to bar an action against an Italian aircraft manufacturer without discussing whether GARA applies to foreign manufacturers).

The fact that we read GARA to protect both domestic and foreign manufacturers does not mean the term "manufacturer" or GARA itself is ambiguous. In fact, GARA's language is very clear: a manufacturer of any aircraft or component of any aircraft meeting the FAA and GARA requirements is protected by the statute of repose. In other words, GARA's statute of repose concerns lawsuits against manufacturers filed in the United States, not suits filed against United States' (American) manufacturers. Reading GARA to include foreign manufacturers does not dilute the congressional intent to help American manufacturers nor lead to an absurd result such that this interpretation cannot stand. American manufacturers reap benefits from the statute of repose, as intended, and, whether by design or accident, foreign manufacturers do as well. The court did not err in finding as a matter of law that GARA applies to a foreign manufacturer.

b. Knowing Misrepresentation Exception

Before a manufacturer can put a new model aircraft into production it must obtain a type certificate for that model from the FAA. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 804-05, 81 L. Ed. 2d 660, 669, 104 S.Ct. 2755, 2760 (1984). The FAA issues a "type" certificate for a new model of aircraft upon its approval of the plane's basic design and analysis of data from ground and flight tests performed on a prototype of the new aircraft to show the plane meets minimum safety criteria set out in federal regulations. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. at 805-06, 81 L. Ed. 2d at 669-70, 104 S.Ct. at 2760-61. The type certificate freezes the design of the aircraft as of the date the FAA issues the certificate. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 985, 102 P. 3d 268, 270, 22 Cal. Rptr. 3d 352, 355 (2004). FAA regulations provide that " 'the holder of a type certificate ... shall report any failure, malfunction, or defect in any product or part manufactured by it that it determines has resulted in any [occurrences].' " *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 657 (E.D. Pa. 2004), quoting 14 C.F.R. §21.3(a) (2004).

If a manufacturer does not fulfill this obligation to report known defects or other safety information to the FAA, GARA provides an exception to the statute of repose. *Burroughs,* 78 Cal. App. 4th at 691, 93 Cal. Rptr. 2d at 131. GARA section 2(b)(1), referred to as the "knowing misrepresentation" exception, provides that GARA offers no repose

"if the claimant pleads with specificity the facts necessary to prove, and

36

proves, that the manufacturer with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft *knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant* to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is *causally related* to the harm which the claimant allegedly suffered." (Emphasis added.) 49 U.S.C. §40101 note, §2(b)(1) (2006).

Mitsubishi having shown that the statute of repose applied to protect it from plaintiff's suit, plaintiff has the burden of proving the existence of facts that would constitute an exception to the statute of repose. *Willett*, 366 Ill. App. 3d at 371, 851 N.E.2d at 635-36. To that end, plaintiff asserted that the knowing misrepresentation exception applied to Mitsubishi. To take advantage of the knowing misrepresentation exception, a plaintiff "must prove: (1) knowing misrepresentation, or concealment, or withholding; (2) of required information that is material and relevant; (3) that is causally related to the harm [the plaintiff] suffered." *Robinson*, 326 F. Supp. 2d at 647, citing *Rickert v. Mitsubishi Heavy Industries, Ltd.,* 923 F. Supp. 1453, 1456 (D. Wyo. 1996). Plaintiff charged that Mitsubishi knowingly misrepresented to the FAA or concealed or withheld from the FAA material information regarding the unsafe condition of the aircraft created by improper flight idle fuel flow setting and propellor rigging, set by the

plane's last mechanic or servicer. The improper settings could, under certain conditions, lead to a negative torque sensing mode during a landing approach and loss of control of the aircraft such as caused the accident here. Plaintiff asserted that Mitsubishi, although aware of these problems, informed the FAA that the basic procedures and tolerances for those components could remain as they had been. The court found plaintiff did not present sufficient evidence to prove the elements of the GARA exception.

Plaintiff argues the court erred in granting summary judgment to Mitsubishi because there exist questions of material fact regarding whether Mitsubishi knowingly misrepresented or concealed or withheld material information from the FAA and, further, the question of whether a defendant "knowingly" misrepresented is a question for a jury. But for a question to go to the jury, that question must be supported by evidence. Here, there is not sufficient evidence to present a question of fact to a jury regarding whether Mitsubishi withheld, concealed or knowingly misrepresented material information to the FAA.

To support its allegation that Mitsubishi withheld, concealed or knowingly misrepresented information, plaintiff presented service bulletin 234, issued by Mitsubishi in October 1998 with the approval of the FAA. The bulletin required flight checks of the fuel flow setting be performed at various altitudes in order to prevent "potential degraded flight handling qualities" and stated that improper settings could cause a negative torque sensing mode, which could result in "unsafe flight

characteristics." In contrast, as evidence of what Mitsubishi should have disclosed to the FAA, plaintiff presented airworthiness directives issued by the Australian and Japanese governments showing those governments were aware that the matters in service bulletin 234 were necessary to prevent loss of control of the aircraft and explaining that incorrect fuel flow setting and propellor rigging were the cause of the problem. To show that Mitsubishi did "finally" inform the FAA of the severity of the problem, plaintiff presented an airworthiness directive issued by the FAA five years after the accident stating that the improper setting and rigging condition could result in "consequent loss of control of the airplane in certain conditions."

It is uncontested that Mitsubishi was fully aware of the problem with the fuel flow setting and propellor rigging. The upshot of plaintiff's argument appears to be that the Japanese and Australian directives, which contain a slightly more detailed description than the service bulletin of the problem with the fuel flow setting and propellor rigging and possible outcome if the problem occurs, shows that Mitsubishi kept information from the FAA. Having compared the wording of service bulletin 234 with the wording of the Japanese and Australian directives, we find little difference between them and the few differences in the language describing the problem in no way indicates that the FAA was unaware of the extent of the problem. Service bulletins 234 and 097/73-001 were disseminated in order to "assure the engine and propellor rigging is adjusted within the manufacturer's specifications and to prevent potential degraded flight handling qualitites associated with flight idle power being set asymmetrically low." The

bulletins explained that incorrectly positioning the power levers, *i.e.*, where an aircraft mechanic or operator fails to position the levers in accordance with the instructions in the service bulletins and maintenance manuals for the aircraft, could result in "loss of control" or "loss of engine power." The FAA approved those bulletins and thus was clearly aware of the problem.

This determination is reinforced by the affidavit of Lawrence Timmons, an aeronautical engineer retained by Mitsubishi America on behalf of Mitsubishi to provide engineering support for the model MU-2 aircraft type certificate and to coordinate issuance of the service bulletin regarding the flight check of the fuel flow settings with the FAA. Timmons testified that on July 16, 1998, he performed a flight test on the same model of aircraft as the accident aircraft here in order to verify that, if the fuel flow settings in the craft are set to the specifications specified by the manufacturer, the plane will perform correctly. His testing showed that if the fuel flow setting was set too low, the plane could encounter negative torque but that, if the settings were corrected pursuant to the maintenance manual for the plane, the problem would not occur.

Timmons stated he was responsible for creating service bulletin 234, at the FAA's request, as an advisory that an aircraft's safety could be negatively affected by improper setting of the idle fuel flow. He stated he was in constant contact with employees of the FAA, kept the FAA fully apprised of the extent of the problem created if fuel settings were not properly set and worked closely with the FAA to create a service bulletin addressing the problem. The flight checks required by the service

bulletin were designed to diagnose whether the flight idle fuel flow in a plane was set too low in order that an improper setting could be adjusted to the correct level.

Timmons' account of his constant contact with the FAA and the FAA's knowledge of the problem is corroborated by the affidavit of Ralph Sorrells, the deputy general manager of Mitsubishi America's aircraft product support division. Sorrells stated that the FAA had requested issuance of a service bulletin to inform the maintenance community that changes to the fuel control can affect a plane's low speed handling characteristics, "which affects safety." The FAA had discovered during its review of the propulsion system for the aircraft that some operators of the aircraft modified the fuel flow setting. Mitsubishi America hired Timmons to coordinate with the FAA to develop the service bulletin based on the FAA's recommendation about minimum fuel flow settings. Sorrells stated Timmons tested a model aircraft in support of the service bulletin, apprised the FAA of the results of the testing and coordinated the bulletin with the FAA. Sorrells himself met with the FAA to discuss the bulletin. He stated the 1998 Japanese and 1999 Australian directives were based on the same information he and Timmons had provided to the FAA. In 1999, Sorrells sent a letter to the FAA inquiring whether the FAA intended to issue an airworthiness directive warning of the problems with the fuel flow setting similar to the Japanese directive. Thereafter, during each meeting between Mitsubishi America and the FAA, as shown by minutes from those meetings, Sorrells continued to inquire whether the FAA would issue a similar airworthiness directive. The FAA issued such an airworthiness directive in

2006.

Plaintiff presented another affidavit by Mermelstein in support of its assertion that Mitsubishi withheld or misrepresented information to the FAA but the affidavit is insufficient to support the assertion. Mermelstein stated that a representation made by Mitsubishi in a July 9, 1998, letter to the FAA was not true and that Mitsubishi knew it was not true. In the letter, Mitsubishi informed the FAA that, "given all the variations that can occur, the flight idle fuel flow settings result in power settings that provide positive engine/propellor thrust throughout the flight envelope." He stated that the July 16, 1998, flight test performed in support of proposed service bulletin 234 showed that, if the rigging and settings were set per the maintenance manual and verified as such, the test plane still experienced negative torque, a condition caused by lack of positive engine/propellor thrust, within the flight envelope for the plane. He stated that, in service bulletin 234, issued on October 7, 1998, Mitsubishi continued to represent to the FAA that an unsafe condition resulting in negative torque could only occur within the flight envelope as a result of improper maintenance.

Mitsubishi did send the FAA a letter on July 9, 1998, informing the FAA that the flight idle fuel setting could remain as they were. This letter was sent before Mitsubishi was fully aware of the extent of the problems caused by a low flight idle fuel flow setting. Not until July 16, 1998, did Mitsubishi perform a flight test on a model of the aircraft. The report of the testing shows the results of a flight idle fuel flow check conducted on a model MU-2B-20 aircraft in accordance with the latest proposed

42

service bulletin, bulletin 234. Although Mitsubishi/Mitsubishi America was aware that mechanics and operators sometimes set the fuel flow setting lower than the recommended level, not until the testing did it know that negative torque and loss of control could result. Mitsubishi's knowledge of the problem did not occur until seven days after its letter to the FAA. Therefore, we do not find the test report evidence that Mitsubishi withheld information from the FAA.

Moreover, the testing showed that, if the fuel flow was reset in accordance with the specifications in the maintenance manual for the plane, the problem would not occur, which is precisely what the FAA intended the service bulletin to convey to the mechanics and owners servicing the plane. Mitsubishi did not misinform the FAA when it stated that the settings could remain as they were, *i.e.*, as specified in the maintenance manual for the aircraft. The settings as specified in the manual were correct. Only if an operator or mechanic lowered the setting beyond the recommended level would a problem occur, and the service bulletin was designed by Mitsubishi and the FAA to avert that problem. Based on the evidence presented, we find nothing to support plaintiff's assertion that Mitsubishi withheld, concealed or knowingly misrepresented material information to the FAA regarding the claimed cause of plaintiff's injuries. There being no question of fact created on this issue, the court did not err in granting summary judgment to Mitsubishi.

Mitsubishi Heavy Industries America

Given its decision that Mitsubishi was protected by GARA, the court also granted

43

summary judgment to Mitsubishi America, finding that Mitsubishi America was the successor manufacturer to Mitsubishi and, therefore, the 18-year limitations period applied to protect Mitsubishi America as well. Plaintiff argues Mitsubishi America is not a successor manufacturer to Mitsubishi and GARA, therefore does not apply to Mitsubishi America.

GARA protects "the *manufacturer* of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, *in its capacity as a manufacturer*." (Emphasis added.) 49 U.S.C. §40101 note, §2(a) (2006). GARA does not define "manufacturer," and the statute does not identify whether successor manufacturers are included within its protections. *Burroughs*, 78 Cal. App. 4th at 692, 93 Cal. Rptr. 2d at 132. Courts have found, however, that a successor to the original manufacturer of a general aviation aircraft or component of such an aircraft and the type certificate holder and/or designer of a general aviation aircraft or part can be considered a "manufacturer" for purposes of GARA's statute of repose, even though the successor did not manufacture the plane or part. *Burroughs,* 78 Cal. App. 4th 681, 93 Cal. Rptr. 2d 124; *Mason v. Schweizer Aircraft Corp.*, 653 N.W. 2d 543 (Iowa 2002); *Pridgen v. Parker Hannifin Corp.*, 588 Pa. 405, 905 A.2d 422 (2006).

In *Burroughs* and *Mason*, the court found the successor to a product line of aircraft or aircraft parts to be a "manufacturer" covered by GARA because, as the holder of either the type certificate or the Parts Manufacturer Approval for the particular aircraft or part involved in the suits, the successor had taken on the duties and

44

obligations of the original manufacturer of the plane or part to report problems to the FAA and disseminate instructions for continued airworthiness of the aircraft or part. *Burroughs,* 78 Cal. App. 4th at 692-93, 93 Cal. Rptr. 2d at 132; *Mason*, 653 N.W. 2d at 548-49. We find that Mitsubishi America has similarly stepped into the shoes of Mitsubishi with regard to fulfilling Mitsubishi's duties and obligations regarding the model MU-2B-20 aircraft and is a "manufacturer" under GARA.

Mitsubishi America is not a "manufacturer" in the standard sense of the word. It does not manufacture anything, let alone general aviation aircraft or parts of such aircraft. Further, Mitsubishi America does not hold a type certificate for the Model MU-2B-20 aircraft at issue here. Mitsubishi continues to hold the type certificate. The holder of the type certificate or PMA for an aircraft has an affirmative duty to report to the FAA any problems with an aircraft or part and to issue instructions for continued airworthiness of the aircraft or part. *Bain v. Honeywell International, Inc.*, 167 F. Supp. 2d 932, 939 (E.D. Tex. 2001); *Butler v. Bell Helicopter Textron, Inc.*, 109 Cal. App. 4th 1073, 1082, 135 Cal. Rptr. 2d 762, 770 (2003). On the basis of these duties, the holder is considered to be the "manufacturer" of the aircraft for GARA purposes. See *Burroughs*, *Mason.* Therefore, Mitsubishi was and continues to be the "manufacturer" entitled to GARA protection. Mitsubishi has, however, pursuant to a licensing agreement and a product support agreement with Mitsubishi America, delegated the performance of those duties to Mitsubishi America. The question is whether Mitsubishi America's assumption of and performance of Mitsubishi's duties under the type

certificate is enough to qualify Mitsubishi America as a "manufacturer" under GARA. We find that it is.

Pursuant to the licensing agreement between Mitsubishi and Mitsubishi America, as of March 1, 1998, Mitsubishi sought to provide for the "continued field product support and maintenance" of any planes manufactured under two type certificates and assorted supplemental type certificates it held, including the Model MU-2B-20 at issue here, by licensing those certificates to Mitsubishi America. In exchange for Mitsubishi America's performance of "all obligations relating to the maintenance of" the certificates, Mitsubishi America would obtain the FAA production certificate for spare parts manufactured in the United States for any planes covered by the type certificates and/or a PMA to produce and/or purchase modification or replacement parts for any of the planes. Mitsubishi America accepted "full authority and responsibility to act on behalf of Mitsubishi as the holder of [the certificates] in all matters involving the FAA." Mitsubishi America and Mitsubishi agreed "that the FAA may view Mitsubishi America and not Mitsubishi as the responsible party in all matters relating to the airworthiness of airplanes covered by [the certificates]." The agreement provides that, although Mitsubishi has the authority to approve any changes to the covered aircraft or type design required by the FAA, Mitsubishi America had the "ultimate authority and responsibility to the FAA for approval of such changes and that Mitsubishi shall comply with Mitsubishi America's directions in such cases, as may be necessary to enable Mitsubishi America to comply with such requirements of the FAA."

Mitsubishi America agreed to be responsible for all communication with the FAA and obtaining approval from the FAA as necessary in order to maintain the aircraft type design. It agreed to maintain all FAA approved manuals and service documents applicable to the covered aircraft; coordinate with and obtain approval from the FAA for changes to those documents; review, print and distribute the approved manuals and service documents; coordinate compliance with airworthiness directives; report failures, problems or malfunctions of the aircraft to the FAA; coordinate corrective action for those problems with the FAA; coordinate with other manufacturers to supply components for the aircraft; and assist the FAA and National Transportation Safety Board with investigation of accidents or incidents involving the aircraft.

Pursuant to the services agreement between Mitsubishi and Mitsubishi America, Mitsubishi America agreed, as an independent contractor, to provide product services relating to assorted models of aircraft, including the MU-2 model. Among the many services Mitsubishi America agreed to provide is "type certificate maintenance and engineering support," which includes acting as liaison with "government entities" regarding the type certificate, coordinating with and obtaining approval from the FAA and "airworthiness authorities" for design changes and revisions of service documents and providing engineering and service documents to the FAA and/or airworthiness authorities as needed. It also agreed to provide "accident/incident investigation," which encompasses investigating accidents involving the aircraft worldwide, except in Japan, and coordinating with government entities regarding the investigations. It would

47

coordinate service centers for the aircraft, manufacture of spare parts, field technical support, training support and printing and distribution of publications related to the covered aircraft.

Like the defendants in *Burroughs* and *Mason*, Mitsubishi America took on the obligations of a general aviation aircraft manufacturer under a type certificate. Granted, unlike in *Burroughs* and *Mason*, Mitsubishi America is not a product line successor to the original manufacturer. However, pursuant to the licensing and services agreements, Mitsubishi America took on Mitsubishi's duties under the type certificates, including reporting problems with the aircraft to the FAA, obtaining approval of any changes in design from the FAA and maintaining the airworthiness of the aircraft by disseminating maintenance manuals and service bulletins. As an entity which has stepped into the shoes of the original manufacturer by taking on the manufacturer's obligations pursuant to a type certificate or PMA, Mitsubishi America is entitled to the protection that would have been accorded Mitsubishi.

Instead of paying employees to perform its obligations, Mitsubishi is paying an independent contractor/licensee to do so. If Mitsubishi's obligations under the type certificate were being performed by an in-house department at Mitsubishi, there would be no question that the department would be covered by the protections of GARA because the department is a part of Mitsubishi. We reach the same conclusion where, as here, an independent contractor is performing those obligations and is being sued on the basis of those obligations. Plaintiff charged that Mitsubishi America negligently

failed to (1) advise owners and operators of the aircraft that the engine flight idle control settings and propellor rigging could result in loss of control of the aircraft; (2) communicate with the FAA regarding failures and defects in the aircraft; (3) properly issue service bulletins on behalf of Mitsubishi and/or verify compliance with mandatory service bulletins; and (4) otherwise provide proper and adequate advice and support to aircraft owners and operators. In other words, plaintiff is suing Mitsubishi America for its failure to perform the duties owed by a manufacturer under a type certificate or PMA. Plaintiff sued Mitsubishi America in its capacity as a manufacturer. *Burroughs*, 78 Cal. App. 4th at 695, 93 Cal. Rptr. 2d at 131; *Mason*, 653 N.W. 2d at 550. We find the protection of GARA extends to an independent contractor performing the duties of the manufacturer, where, as here, the plaintiff's claims against the independent contractor are based on its performance of those duties, *i.e.*, on the contractor's acting as a "manufacturer". The court did not err in granting summary judgment to Mitsubishi America.

For the reasons stated above, we affirm the circuit court's grant of summary judgment to Mitsubishi, Mitsubishi America and Honeywell on all counts; reverse the court's grant of summary judgment to Air 1st on plaintiff's negligence and breach of implied warranty counts; affirm the court's grant of summary judgment to Air 1st on the express warranty allegations; reverse the court's grant of summary judgment to Woodward on all counts; and dismiss plaintiff's appeal from the court's order dismissing plaintiff's strict liability counts against Air 1st.

49

Affirmed in part, reversed in part and dismissed in part; cause remanded.

CUNNINGHAM, P.J., and HOFFMAN, J., concur.

SOUTH SIDE TRUST AND SAVINGS BANK OF PEORIA, as personal representative of the Estates of Christine Marie White, deceased, and John Michel White, deceased,

Plaintiff-Appellant,

v.

MITSUBISHI HEAVY INDUSTRIES, LTD, a Corporation, MITSUBISHI HEAVY INDUSTRIES AMERICA, INC., a Corporation, HONEYWELL INTERNATIONAL, INC., a Corporation, WOODWARD GOVERNOR COMPANY, a Corporation, and AIR 1ST AVIATION COMPANIES, a Corporation,

Defendants-Appellees

(Stan Blaylock and Wayne Bates,

Defendants).

No. 1-09-0148

Appellate Court of Illinois
First District, Second Division

March 31, 2010

JUSTICE KARNEZIS delivered the opinion of the court.

CUNNINGHAM, P.J., and HOFFMAN, J., concur.

Appeal from the Circuit Court of Cook County.

The Honorable Dennis J. Burke, Judge Presiding.

For APPELLANT: Nolan Law Group, of Chicago (Donald J. Nolan and William J. Jovan,

of counsel)

For APPELLEES MITSUBISHI HEAVY INDUSTRIES, LTD. and MITSUBISHI HEAVY INDUSTRIES AMERICA, INC.: O'Hagan Spencer LLC, of Chicago (Patrick J. Keating and Elizabeth M. Dillon, of counsel) and Condon & Forsyth LLP, of New York, New York (Marshall S. Turner, John D. Horenstein and Timothy H. Eskridge, Jr., of counsel)

For APPELLEE HONEYWELL INTERNATIONAL INC.: Perkins Coie LLP, of Chicago (Bates McIntyre Larson and Charles W. Mulaney, of counsel)

For APPELLEE WOODWARD GOVERNOR: Rothschild, Barry & Myers, LLP, of Chicago (Daniel Cummings and Robin K. Powers, of counsel)

FOR APPELLEE AIR 1ST AVIATION COMPANIES, INC.: McCullough, Campbell & Lane, LLP, of Chicago (Patrick M. Graber and Stephen D. Koslow, of counsel)